CARGILL GRAIN CO., INC. *v.* UNITED STATES (No. 4381)[1]

[1] C. A. D. 219.

United States Court of Customs and Patent Appeals, November 2, 1942

*Siegel & Mandell* (*Sidney Mandell*, of counsel) for appellant.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, of counsel), for the United States.

[Oral argument October 7, 1942, by Mr. Mandell and Mr. Rao]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Third Division) overruling two protests of appellant against the assessment by the collector at New York of duty upon certain importations from Poland of rye, entered for consumption at the subport of Albany, N. Y., in 1934 and 1935.

For the purposes of trial the protests were consolidated.

The cause was submitted to the Customs Court upon a stipulation of the parties which, omitting paragraph 12, reads as follows:

It is hereby stipulated and agreed, by and between the parties hereto, by their respective attorneys:

1. On November 21, 1934 the plaintiff herein made one importation (Entry No. A–70069), hereinafter called the 1934 importation when referred to separately, and from time to time during the year 1935 made a total of nine importations, hereinafter called the 1935 importations when referred to separately, of Polish rye, a grain, at Albany, N. Y.

2. With respect to each importation, the importer made and completed an entry for consumption and deposited the estimated duties thereon, at which time the collector forthwith issued to the importer an official permit (Form 7501–A) for the delivery of the rye to the importer, a copy of a typical one of which is annexed hereto, and made a part hereof, marked "A." No entry for warehouse was made with respect to any of said importations

3. With respect to each of the 1935 importations, the Collector upon request of the importer and after the expiration of one day after the entry of the vessel, ordered that the rye be sent to the grain elevator owned and operated by the importer and located on Van Rensselaer Island in Albany, N. Y. With respect to five of the 1935 importations, such order was issued prior to the making of entry for consumption and deposit of estimated duties as set forth in paragraph 2 hereof. With respect to the remaining four of the 1935 importations, such order was issued subsequent to such entry for consumption and deposit of estimated duties. A copy of a typical one of such orders, executed on Form 3193, entitled " 'General Order' to Send Unpermitted Packages from Wharf to Public Store," is attached hereto, made a part hereof and marked "B." With respect to the 1934 importation, no such order was issued.

4. With respect to the said grain elevator, the importer, prior to the time of the importations involved herein, pursuant to the provisions of Section 555 (a), Tariff Act of 1930, filed with the Collector its bond to constitute said grain elevator a bonded warehouse for the purposes set forth in said bond. This bond was in full force and effect at the time of each importation involved herein, and the said grain elevator was a bonded warehouse as authorized by said section 555 (a) to the extent and for the purposes set forth in the bond. A copy of said bond, together with a copy of a letter from the importer to the Collector, dated July 2, 1932, and a copy of a letter from the Deputy Collector in Charge to the Collector, dated July 12, 1932, relating to said bond, are annexed hereto, made a part hereof, and marked "C."

5. With respect to each importation, the rye was inspected by the Department of Agriculture, and after the rye was placed in the said grain elevator, and after the making of entry for consumption, deposit of estimated duties, and issuance of the delivery permit, the Department of Agriculture made a finding that the rye was adulterated, consisting in whole or in part of filthy, decomposed or putrid vegetable substances, and contained animal excreta, and that it did not comply with the Food and Drugs Act of June 30, 1906. However, the Department of Agriculture granted permission to the importer to recondition the rye by removing the objectionable matter for destruction under Customs supervision. Upon such finding the Collector, pursuant to Article 541 (e) of the Customs Regulations of 1931, issued to the importer a statement of the violation, setting forth said condition that the rye might be thus reconditioned and the objectionable matter so destroyed. A copy of a typical one of such statements of violations and conditions (Form "F. D. 776a") is annexed hereto, and made a part hereof, marked "D."

6. After the issuance of each such statement of violation and condition, and after the making of entry for consumption, deposit of estimated duties, and issuance of the delivery permit, the importer with respect to each importation filed

an application, using Customs Form 3499, to recondition the rye by drying and/or cleaning in the said grain elevator in order to comply with the said condition fixed by the Department of Agriculture. The Deputy Collector in charge at Albany issued a permit, with respect to each importation, for the operation requested. A copy of a typical one of such applications and permits is annexed hereto, made a part hereof, and marked "E."

7. After the issuance of each such permit to recondition, the importer, while the rye was in said grain elevator, subjected it to various reconditioning processes, to wit, drying and/or cleaning, which was apparently done under Customs supervision.

8. As a result of such reconditioning processes, there were certain losses from the quantities originally placed in the said grain elevator after the unlading of the vessels. These losses were of three kinds:

(1) Losses amounting to 51050 bushels 10 lbs. of visible impurities;

(2) Losses amounting to 164074 bushels, and 40 lbs. due to loss of moisture incurred in the drying process, and

(3) Invisible losses amounting to 98027 bushels and 50 lbs. incurred in the cleaning process.

9. With respect to each of the 1935 importations, after such reconditioning had been effected, the importer lodged with the Collector the delivery permit which had been issued to the importer at the time entry for consumption was made, as set forth in paragraph 2 hereof, and removed the reconditioned rye from the said grain elevator. With respect to the 1934 importation, the importer lodged such delivery permit with the Collector forthwith upon receiving it at the time said consumption entry was made. No warehouse withdrawal, as provided in Sections 556 and 557, Tariff Act of 1930, and Article 324 of the Customs Regulations of 1931, was filed with respect to any of the importations.

10. The general procedure followed with respect to these importations, whereby no entries for warehouse were made, and the grain placed in the elevator under an order entitled " 'General Order' to Send Unpermitted Packages from Wharf to Public Store," was carried out in an effort to provide the importer with the privilege of storing the rye in a bonded elevator for a period of one full year under the provisions of Sections 490 and 491 of the Tariff Act of 1930 instead of for a period of ten months as then provided for storage of grain entered for warehouse, by Section 557 of said Tariff Act.

11. The entries were liquidated at 15 cents per bushel of 56 pounds under the provisions of paragraph 728, Tariff Act of 1930. There is no controversy herein relative to this classification. However, in liquidating and assessing duties, the Collector made allowance for the poundage of the refuse obtained from the cleaning process which was destroyed under Customs supervision, but refused to make allowance for the loss in weight in excess of that actually destroyed under Customs supervision.

\*      \*      \*      \*      \*      \*      \*

Paragraph 12 of the stipulation is a detailed recapitulation of the facts with respect to each of the involved entries, which, in view of our conclusion, it is not necessary to quote.

It appears from paragraph 8 of the stipulation that there was a total loss, due to drying and cleaning, of 313,152 bushels and 44 pounds, of which 51,050 bushels and 10 pounds were visible impurities, 164,074 bushels and 40 pounds were losses due to evaporation of moisture incurred in the drying process, and 98,027 bushels and 50 pounds were invisible losses incurred in the cleaning process.

With respect to the 51,050 bushels and 10 pounds of visible impurities, it appears that these impurities were destroyed under customs supervision and allowance was made therefor by the collector in liquidating the entries; but he refused to make any allowance for the other losses above set out.

Appellant protested the liquidations, claiming that duties should have been assessed only on the quantities of merchandise entering into the trade and commerce of this country, and that no duties should be levied "upon the rye lost through evaporation, drying, cleaning, sorting, or any other reconditioning process."

The trial court overruled the protests, holding that appellant was not entitled to any allowance for loss occasioned by evaporation of moisture or for invisible impurities removed in the cleaning process. Judgment was entered accordingly, and appellant took this appeal.

Upon the oral argument before us appellant waived any claim for losses occasioned by evaporation of moisture, and the only issue before us is whether the trial court erred in holding that appellant was not entitled to an allowance for losses due to invisible impurities removed in the cleaning process, amounting to 98,027 bushels and 50 pounds.

The following provisions of the Tariff Act of 1930 are pertinent to the issue before us.

Par. 728. Rye, 15 cents per bushel of fifty-six pounds; * * *

SEC. 490. GENERAL ORDERS.

(a) Incomplete Entry.—Whenever entry of any imported merchandise is not made within the time provided by law or the regulations prescribed by the Secretary of the Treasury, or whenever entry of such merchandise is incomplete because of failure to pay the estimated duties, or whenever, in the opinion of the collector, entry of such merchandise can not be made for want of proper documents or other cause, or whenever the collector believes that any merchandise is not correctly and legally invoiced, he shall take the merchandise into his custody and send it to a bonded warehouse or public store, to be held at the risk and expense of the consignee until entry is made or completed and the proper documents are produced, or a bond given for their production.

(b) At Request of Consignee.—At the request of the consignee of any merchandise, or of the owner or master of the vessel or the person in charge of the vehicle in which the same is imported, any merchandise may be taken possession of by the collector after the expiration of one day after the entry of the vessel or report of the vehicle and may be unladen and held at the risk and expense of the consignee until entry thereof is made.

SEC. 507. TARE AND DRAFT.

The Secretary of the Treasury is hereby authorized to prescribe and issue regulations for the ascertainment of tare upon imported merchandise, including the establishment of reasonable and just schedule tares therefor, but in no case shall there be any allowance for draft or for impurities, other than excessive moisture and impurities not usually found in or upon such or similar merchandise.

SEC. 562. MANIPULATION IN WAREHOUSE.

Unless by special authority of the Secretary of the Treasury, no merchandise shall be withdrawn from bonded warehouse in less quantity than an entire bale,

cask, box, or other package; or, if in bulk, in the entire quantity imported or in a quantity not less than one ton weight. All merchandise so withdrawn shall be withdrawn in the original packages in which imported unless, upon the application of the importer, it appears to the collector that it is necessary to the safety or preservation of the merchandise to repack or transfer the same: *Provided*, That upon permission therefor being granted by the Secretary of the Treasury, and under customs supervision, at the expense of the proprietor, merchandise may be cleaned, sorted, repacked, or otherwise changed in condition, but not manufactured, in bonded warehouses established for that purpose and be withdrawn · therefrom for exportation to a foreign country or for shipment to the Virgin Islands, American Samoa, or the island of Guam, without payment of the duties, or for consumption, upon payment of the duties accruing thereon, in its condition and quantity, and at its weight, at the time of withdrawal from warehouse, with such additions to or deductions from the final appraised value as may be necessary by reason of change in condition. The basis for the assessment of duties on such merchandise so withdrawn for consumption shall be the entered value or the adjusted final appraised value, whichever is higher, and if the rate of duty is based upon or regulated in any manner by the value of the merchandise such rate shall be based upon or regulated by such adjusted final appraised value; but for the purpose of the ascertainment and assessment of additional duties under section 489 of this Act adjustments of the final appraised value shall be disregarded. The scouring or carbonizing of wool shall not be considered a process of manufacture within the provisions of this section.

Section 557 of said act provides for warehouse entries of merchandise, but the stipulation shows that no such entries are here involved.

The pertinent provisions of the Food and Drugs Act of June 30, 1906, 34 Stat. 768, as amended, relating to adulterated or misbranded foods, read as follows:

2. *Same; interstate or foreign commerce is prohibited; sale in Territories or District of Columbia; penalty.*—The introduction into any State or Territory or the District of Columbia from any other State or Territory or the District of Columbia, or from any foreign country, or shipment to any foreign country of any article of food or drugs which is adulterated or misbranded, within the meaning of sections 1 to 15, inclusive, of this title, is prohibited; * * *.

11. *Examination of specimens; notice of adulteration or misbranding; hearing; certification of violations to district attorney; notice of judgment.*—The examinations of specimens of foods and drugs shall be made in the Bureau of Chemistry of the Department of Agriculture, or under the direction and supervision of such Bureau, for the purpose of determining from such examinations whether such articles are adulterated or misbranded within the meaning of sections 1 to 15, inclusive, of this title; and if it shall appear from any such examination that any of such specimens is adulterated or misbranded, the Secretary of Agriculture shall cause notice thereof to be given to the party from whom such sample was obtained. Any party so notified shall be given an opportunity to be heard, under such. rules and regulations as may be prescribed as aforesaid, * * *.

15. *Examination of samples of imports; refusal of admission and delivery to consignee; delivery to consignee pending examination and decision on bond; charges for storage and lien therefor.*—The Secretary of the Treasury shall deliver to the Secretary of Agriculture, upon his request from time to time, samples of foods and drugs which are being imported into the United States or offered for import, giving notice thereof to the owner or consignee, who may appear before the Secretary of Agriculture, and have the right to introduce testimony, and if it appear

84

from the examination of such samples that any article of food or drug offered to
be imported into the United States is adulterated or misbranded within the
meaning of sections 1 to 15, inclusive, of this title, or is otherwise dangerous to the
health of the people of the United States, or is of a kind forbidden entry into, or
forbidden to be sold or restricted in sale in the country in which it is made or
from which it is exported, or is otherwise falsely labeled in any respect, the said
article shall be refused admission, and the Secretary of the Treasury shall refuse
delivery to the consignee and shall cause the destruction of any goods refused
delivery which shall not be exported by the consignee within three months from
the date of notice of such refusal under such regulations as the Secretary of the
Treasury may prescribe.  The Secretary of the Treasury may, however, deliver
to the consignee such goods pending examination and decision in the matter on
execution of a penal bond for the amount of the full invoice value of such goods,
together with the duty thereon, and on refusal to return such goods for any cause
to the custody of the Secretary of the Treasury, when demanded, for the purpose
of excluding them from the country, or for any other purpose, said consignee
shall forfeit the full amount of the bond.  *  *  *

The principal question before us is whether the provisions of section
562 of the Tariff Act of 1930 are applicable to the case at bar.

We are in agreement with the view of the trial court that, inasmuch
as the involved merchandise was not entered for warehousing under
the provisions of section 557 of said act, the provisions of section 562
have no application to the case at bar.

The proviso of section 562 clearly provides that the cleaning of
merchandise subject to the provisions of that section may be made
upon permission of the Secretary of the Treasury; that the merchan-
dise may be withdrawn for consumption "upon payment of the duties
accruing thereon, in its condition and quantity, and at the weight, at
the time of withdrawal from warehouse,  *  *  *."  This language
clearly implies that the proviso is applicable only to merchandise
which has been entered for warehousing, and does not apply to mer-
chandise where consumption entries have been made and delivery
permits issued prior to the manipulation of the merchandise.

The stipulation sets forth that consumption entries were made with
respect to all of the involved merchandise, and no entry for warehouse
was made with respect to any of the importations, and no warehouse
withdrawals, as provided in section 557 of said tariff act and article 324
of the Customs Regulations, 1931, were filed with respect to any of
the importations.

According to the stipulation, permission to recondition the rye was
not given by the Secretary of the Treasury, but by the Department
of Agriculture.

Moreover, we are unable to agree with appellant that the mer-
chandise was retained in appellant's bonded warehouse under the
provisions of section 490 hereinbefore quoted.

Paragraph 10 of the stipulation states that the grain was sent to
appellant's elevator under a "General Order" "in an effort to provide

the importer with the privilege of storing the rye in a bonded elevator for a period of one full year under the provisions of section 490 and 491 of the Tariff Act of 1930, instead of for a period of ten months as then provided for storage of grain entered for warehouse, by Section 557 of said Tariff Act."

It thus appears that appellant sought to secure an advantage by refraining from making warehouse entries of the merchandise under the provisions of section 557, and now claims the same privileges that would have been accorded to it had it made such warehouse entries.

We are of the opinion, as was the trial court, that the retention of the rye in appellant's bonded warehouse was not authorized by section 490. Paragraph (a) of that section clearly has no application to imported merchandise for which consumption entries have already been completed, and the collector believes that the merchandise has been correctly and legally invoiced. There are no facts in the case at bar indicating that the collector believed that the merchandise was not correctly invoiced.

Paragraph (b) of the section, by its plain terms, has application to imported merchandise only "until entry thereof is made."

As it is admitted that consumption entries of all of the merchandise were made prior to its cleaning, it is obvious that at the time of such cleaning the merchandise was not in customs custody under the provisions of section 490, section 557, or any other provision of the customs law, and we are in agreement with the views of the trial court, stated in its decision as follows:

After the duties were paid and the delivery permits issued, the collector had performed all of his duties in connection with the imported merchandise. Any detention of the merchandise thereafter would have been for other than customs purposes. Therefore the privilege allowed the importer of having the merchandise retained in a bonded warehouse for his own convenience in meeting the demands of the Department of Agriculture could not be construed as an action beneficial to the collector. All actions taken by the customs authorities after the issuance of the delivery permits were performed as agents of the Department of Agriculture. The custody of the merchandise in warehouse was in fact the custody of the Department of Agriculture rather than the collector. Consequently the merchandise herein is in the same position as if it had been delivered to the importer under a redelivery bond awaiting the action of the Department of Agriculture under the pure food laws.  *  *  *

This view is supported by the case of *United States* v. *De Villamil*, 12 Ct. Cust. Appls. 255, T. D. 40267, which involved the dutiable status of certain meat imported during the time the Tariff Act of 1913 was in effect. Consumption entries were made on May 26, 1921, which was prior to the enactment of the Emergency Tariff Act of 1921. Delivery of the merchandise was delayed because of its inspection by the Bureau of Animal Industry of the Department of Agriculture, which inspection was provided for by paragraph 545 of the Tariff Act of

1913. The court held that the merchandise there involved was free of duty under the Tariff Act of 1913. In its opinion the court stated:

The goods involved in this appeal were entered for consumption on May 26, and, as they were duty-free goods, the importer would have been entitled to their delivery on the making of that entry, were it not for the fact that paragraph 545 and the Treasury regulations required their detention to enable the Bureau of Animal Industry of the Department of Agriculture to make an inspection of the meats.

The meats imported were not withheld from delivery because of any customs service which remained to be performed, and it can not be said, therefore, that the goods were in customs custody for customs purposes. They were withheld by the collector of customs acting for the Bureau of Animal Industry and were therefore in law and in fact in the custody of the Bureau of Animal Industry.

In the case at bar, had it not been for the action by the Department of Agriculture, appellant would have paid duties upon the total weight of the merchandise as entered, with no allowances; and so far as the amount of duties is concerned, the Government could not in any way benefit from the cleaning process carried out in appellant's bonded warehouse, other than to render the merchandise admissible into the United States.

It is our opinion that all of the acts performed by the customs authorities subsequent to the consumption entries and issuance of delivery permits, and prior to the protested liquidations, were performed as agents of the Department of Agriculture.

Appellant relies upon certain language used by us in the case of *Rosenbaum Grain Corporation et al.* v. *United States*, 26 C. C. P. A. (Customs) 202, C. A. D. 18. That case involved the weights of Polish rye which was placed in a private unbonded warehouse after consumption entries therefor had been made. As in the case at bar the rye was cleaned with the permission of the Department of Agriculture and certain losses were incurred in that process. Allowance was made for the impurities destroyed under customs supervision, but no allowance was made for invisible losses. Appellant claimed that the weights of the rye after the cleaning should govern the liquidations as provided in section 562. We affirmed the judgment of the trial court overruling the protests of appellant. In our decision we stated:

Appellants call attention to section 562 of said tariff act, which provides, among other things, that merchandise placed in a bonded warehouse may be cleaned and thereafter withdrawn for consumption upon payment of the duties accruing thereon in its condition and quantity and at its weight at the time of withdrawal from warehouse; that if said rye had been placed in bonded warehouses appellants would have been entitled to refunds of duties here sought and appellants contend that therefore it is clear that Congress did not intend that, when a loss occurs through cleaning or reconditioning before goods have entered commerce, duties should be imposed upon goods so lost.

Section 562 is a statutory provision relating only to goods entered in bonded warehouse. If Congress had intended that a like practice should prevail with

respect to goods not placed in bonded warehouse it presumably would have expressly so provided. While in the case at bar it may be assumed that the losses were the same as if the rye had been placed in bonded warehouses and cleaned, it is easy to perceive that mischiefs could arise and the way made easy to avoid the payment of proper duties if the rule were made general. At any rate it is not within our province to broaden the provisions of the statute so as to embrace the merchandise here involved.

It will be noted that in the above quotation we stated that "Section 562 is a statutory provision relating only to goods entered in bonded warehouse," meaning goods entered for warehousing. This was a correct statement of the law, but later in the same paragraph we used the term "placed in bonded warehouses" instead of "entered in bonded warehouse" or "entered for warehousing." As applied to the facts in that case the use of the broader term "placed" was immaterial for the merchandise there involved was neither entered in a bonded warehouse nor placed in one, and it was not necessary to our decision to pass upon the question of whether section 562 was applicable to merchandise placed, but not entered for warehousing, in a bonded warehouse.

In the quoted language we discussed somewhat the mischiefs that might arise if the provisions of section 562 were held to be applicable to merchandise placed in private warehouses. Even if such mischiefs would not arise if merchandise is placed in a bonded warehouse and there retained under supervision of Government authorities, we may not construe the provisions of section 562 beyond their plain intent.

Holding as we do that the provisions of section 562 are not applicable to the facts in the case at bar, the remaining question is whether appellant was otherwise entitled to an allowance for the "invisible" loss of weight in the rye due to the cleaning process, which, the stipulation states, amounted to 98,027 bushels and 50 pounds.

It is appellant's contention that all of this loss constituted a nonimportation, and that the rye would not have been permitted admission to the United States had not this entire loss occurred. Appellant seeks to distinguish this case from the *Rosenbaum* case, *supra*, in that in the case at bar the loss shown by cleaning is established, while in the *Rosenbaum* case the losses resulting from the cleaning and drying processes were not separately shown. This is true, but appellant has not shown that the entire invisible loss in the instant case resulting from cleaning constituted a non-importation, nor has it shown that any definite part of such losses consisted of prohibited merchandise.

In our opinion in that case we stated:

We cannot agree with the contention of appellants that all of the loss resulting from the cleaning and drying of the rye should be considered as a nonimportation. It is clear that a part of such loss arose in the drying of the rye, the so-called "good rye" released weighing less at the time of such release than it did at the

time of entry of the rye. It is admitted that this "good rye" was imported and therefore none of it may be considered as a nonimportation. There is no claim that at the time of entry the rye contained excessive moisture, but on the contrary it is established that it did not.

There is no evidence in the record from which it can be ascertained what proportion of the loss was due to dust, to excreta, or to screenings, etc., which could not be preserved for destruction under customs supervision. While the entire loss is established, and the quantity of excreta, etc., destroyed under customs supervision is also established, the difference between these two amounts is shown only as consisting of loss through moisture, dust, excreta, etc., which passed off in the air in the cleaning and drying processes, and necessarily the separate amounts of each could not be determined. This is termed in the evidence as an "invisible loss."

The same observation is applicable to the case at bar, omitting the reference to moisture, claim for which has been properly waived by appellant.

Section 507, *supra*, provides that "in no case shall there be any allowance for draft or for impurities, other than excessive moisture and impurities not usually found in or upon such or similar merchandise."

The statute clearly contemplates that there may exist impurities in imported merchandise, but that their presence shall not affect the duties to be levied with respect to such merchandise unless the impurities are of a character, or possibly in an amount, not usually found in such or similar merchandise.

Surely, in view of section 507, if appellant removed all the impurities from the rye, including those usually found in such or similar merchandise, it could not, without proof of the amount of impurities not usually found in such or similar merchandise, rightfully claim that all of the impurities constituted a nonimportation and that allowance should be made therefor.

Inasmuch as there is nothing in the record to establish what portion, if any, of the invisible impurities removed was of a character usually found in such or similar merchandise, or what portion, if any, was in excess of impurities usually found in such or similar merchandise, no allowance can properly be made for the invisible losses resulting from the cleaning processes.

Whether the word "excessive" in section 507 should be held applicable to impurities, we are not called upon to determine here, for the burden was upon appellant to establish either the amount of the excess of impurities over those usually found in such or similar merchandise, or that the invisible impurities removed by cleaning were of a character not usually found in such or similar merchandise. It has done neither.

Upon the issues as presented to us we find no error in the decision of the trial court, and the judgment appealed from is *affirmed*.